**UNITED STATES of America and Salvatore Coviello, Revenue Agent, Internal Revenue Service**

v.

**Hickey J. LUBUS.**

**Civ. No. B–707.**

United States District Court,
D. Connecticut.

Jan. 23, 1974.

Peter Mear, Asst. U. S. Atty., New Haven, Conn., Robert Sevila, Dept. of Justice, Washington, D. C., for petitioners.

Sherin V. Reynolds, Bridgeport, Conn., for respondent.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This is an action to enforce compliance with a summons issued by the Internal Revenue Service to respondent, Hickey J. Lubus, pursuant to 26 U.S.C. § 7602. The Internal Revenue Service, as part of its Tax Returns Preparers Project,[1] summoned respondent to give testimony and produce a list of the names and addresses of individuals for whom he prepared federal income tax returns for the calendar years 1970 and 1971. He appeared on the specified date, December 1, 1972, but refused to testify or produce the requested records. The Government then instituted this action seeking judicial enforcement of the summons.[2] A hearing was held on Octo-

---

1. *See* Department of the Treasury, I.R.S. Manual Supplement, Tax Preparers Project (June 30, 1972). The nationwide Project originated with a "concentrated test project" in the Southeast Region that proved "successful in identifying return preparers who fraudulently increased exemptions, grossly exaggerated deductions and omitted taxable income from their clients' returns." *Id.*, § 2.01. The strategy of the Project is to achieve efficient "teamwork" of Internal Revenue Service regions and divisions in order to "eliminate return preparers' fraudulent practices, prevent victimization of uneducated and uninformed individual taxpayers and to increase compliance by taxpayers who were aware that their returns were not properly prepared." *Id.*, § 2.02.

2. The Government seeks enforcement only to require disclosure of respondent's lists of

ber 2, 1973, at which witnesses for the Government and respondent testified.

Respondent resists enforcement on three grounds: first, that compelled compliance with the summons would constitute a denial of his Fifth Amendment privilege against self-incrimination; second, that the summons is excessively vague and broad, because it fails to set forth the names of any specific taxpayers whose liabilities are under investigation; and third, that the information sought by the Internal Revenue Service is already in its possession and practicably available.

Under the particular circumstances of this case, respondent's assertion of his self-incrimination privilege is a sufficient reason to deny enforcement of the summons. There are two quite different types of analysis that lead to this conclusion. Since cases construing the Fifth Amendment have not always kept the distinction clear, some elaboration may be useful.

■ There are two different contexts in which courts have had to determine the validity of an invocation of the self-incrimination privilege. The first arises when a person, required by valid compulsory process to be a witness, invokes the privilege in response to a particular question. The person may be a witness at trial, before a grand jury, or before an investigative body that has subpoena power. When the privilege is invoked, the inquiry is usually whether the information sought by the particular question asked might tend to incriminate. The test is often stated to be whether the answer might be a link in the chain of evidence needed to convict the witness. Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

■ The second context arises when a person, who may or may not be a witness in a proceeding, invokes the privilege as a defense to complying with a re-

quirement, imposed by law, to furnish certain information, either in testimony or documents. When the privilege is invoked in this context, the inquiry is usually whether the "public need" for the information outweighs the "individual claim to constitutional protections." California v. Byers, 402 U.S. 424, 427, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). The claim of privilege has been upheld as to some required disclosures, Albertson v. S.A.C.B., 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965); Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and rejected as to others, California v. Byers, *supra*; Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948).

Some confusion has developed because the phrase "compelled disclosure" has been applied to the demand for information in both contexts, yet the nature of the compulsion is different in each. In the first context, the compulsion flows from the power of the questioning body to issue subpoenas, i. e., the availability of compulsory process. In the second context, the compulsion flows from the legal requirement that certain information be disclosed. The Supreme Court has confined this second context to situations where the requirement of disclosure was imposed by statute, as in *Albertson*, *Marchetti*, and *Byers*, or by regulation, as in *Shapiro*. The doctrine, which has sometimes been characterized as a "required records" exception to the self-incrimination privilege, has never been applied to a situation where the only "compulsion" upon a witness to answer was the questioning body's power to subpoena. Obviously, if the balancing test of *Byers* were applied to determine the validity of a plea of privilege by every trial, grand jury, or investigative agency witness, the "required records" exception would become the general rule.

■ This case initially appears to arise in the first context, i. e., the Inter-

---

1970 and 1971 customers, not to require respondent to testify. Thus no issue is raised as to whether respondent would be entitled to invoke his self-incrimination privilege

with respect to specific questions seeking information other than his 1970 and 1971 customers.

nal Revenue Service has the power of compulsory process by virtue of § 7602 to propound relevant questions, but there is no statute or regulation that explicitly imposes upon the respondent the obligation to maintain and disclose the specific information that the Internal Revenue Service now seeks. Since there is no question that the Fifth Amendment privilege is available to a person who appears before an Internal Revenue Service agent pursuant to § 7602, United States v. Silverstein, 210 F.Supp. 401 (S.D.N.Y.), aff'd, 314 F.2d 789 (2d Cir.), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1962), the issue here could be viewed as the traditional one of whether the respondent has a realistic apprehension that the information sought might tend to incriminate him.

However, the only court of appeals that has thus far considered the validity of a plea of Fifth Amendment privilege to a summons seeking the type of information sought here has analyzed the problem as if the case arose in the second context, that of a lawfully compelled disclosure, and has enforced the summons upon a conclusion that the balance mandated by *Byers* weighed in favor of the Internal Revenue Service. United States v. Turner, 480 F.2d 272 (7th Cir. 1973).[3] *Turner* employed this analysis because the court viewed the case as one involving a "regulatory scheme." The opinion makes clear that the regulatory scheme relied upon is the Internal Revenue Service Tax Preparers Project. However, this project "regulates" what Internal Revenue Service agents will do in performing their duties of collecting revenue and perhaps uncovering instances of fraud. The Tax Preparers Project does not include any regulation that imposes upon tax preparers a duty to maintain and disclose a list of their customers. Thus the existence of the project *per se* should not subject the privilege to the *Byers* test. Otherwise

any investigative agency could subject a witness's privilege to a "public need"-"private right" balancing test simply by instructing its agents to focus their inquiry on specific categories of targets.

There is a possible theory that might support a testing of respondent's privilege by the *Byers* formula. A regulation requires any person to sign his name to every return that he prepares. 26 C.F.R. § 1–6065–1(b)(1972). *Turner* relied on this regulation only to minimize the weight to be accorded the preparer's claim of privilege in making the *Byers* analysis, and specifically disclaimed reliance on the regulation for purposes of showing that it created a "required records" exception to the privilege. 480 F.2d at 278. Nevertheless only a slight extension of the *Shapiro-Marchetti-Byers* cases is needed to consider this regulation a sufficient compulsion to invoke the *Byers* formula. The regulation requires a person to disclose the fact that he is the preparer of each of the returns he prepares. The disclosure presently sought—a list of the preparer's customers—is simply a collection of the facts previously required to be disclosed. While no case appears explicitly to have considered as "required disclosures" a request for assembled information previously required by regulation to be disclosed *seriatim*, the considerations that were thought to justify the balancing approach in *Shapiro* and its progeny are arguably of equal force here. Of course viewing the lists sought here as information required by regulation to be disclosed does not defeat the privilege, but only subjects it to the balancing test of *Byers*. Because the balancing approach can thus be deemed applicable and because it in fact was employed by the one court of appeals to have considered the issue in a similar context, it will be used here. Obviously if the *Byers* balance is struck in respondent's favor, his claim of privilege, tested in the absence of the *Byers* weighing,

---

3. Perhaps taking their cue from *Turner*, both sides in this case have also analyzed the issues only in terms of whether the *Byers* test is met.

must be sustained, since *Byers*, where applicable, permits a strong showing of public need to outweigh what would otherwise be a valid claim of privilege.

The "private right" portion of the balancing involves an assessment of the degree of risk of self-incrimination resulting from disclosure, for the privilege can thwart compelled disclosures only if the hazards are "substantial," California v. Byers, *supra*, 402 U.S. at 431, 91 S.Ct. 1535, 29 L.Ed.2d 9, or "real and appreciable," Marchetti v. United States, *supra*, 390 U.S. at 48, 88 S.Ct. 697, 19 L. Ed.2d 889 (1968). Assessing risk of self-incrimination requires consideration of various objectively ascertainable factors —irrespective of the subjective fears or perceptions of the individual—principally the composition of the group from which information is sought, and the nature and form of the disclosure. The risk is greatest where the individual is a member of a group that is "highly selective" and "inherently suspect of criminal activities," California v. Byers, *supra*, 402 U.S. at 430, 91 S.Ct. 1535, 29 L.Ed. 2d 9; Marchetti v. United States, *supra*, 390 U.S. at 47, 88 S.Ct. 697, 19 L.Ed.2d 889; Albertson v. SACB, 382 U.S. 71, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965), or where the activities are in "an area permeated with criminal statutes" so that responses to the questions might involve individuals in admissions of a crucial element of a crime, Albertson v. SACB, *supra*, 382 U.S. at 79, 86 S.Ct. at 199. The hazards of self-incrimination are far fewer, and the Government's need for the information far greater, when the inquiry is "directed at the public at large," *id.*, in "an essentially non-criminal and regulatory area of inquiry," Marchetti v. United States, *supra*, 390 U.S. at 57, 88 S.Ct. at 707, pursuant to widely applicable filing or reporting requirements, California v. Byers, *supra*, 402 U.S. at 427, 91 S.Ct. 1535, 29 L.Ed.2d 9; see also Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). Even when the hazards of self-incrimination to a particular individual are substantial, a general reporting requirement will be enforced if the questions are "neutral on their face," Albertson v. SACB, *supra*, 382 U. S. at 79, 86 S.Ct. 194, 15 L.Ed.2d 165, and if the Governmental purpose is noncriminal and self-reporting is "indispensible" to its fulfillment. California v. Byers, *supra*, 402 U.S. at 431, 91 S.Ct. 1535, 29 L.Ed.2d 9.

Having been brought to this stage of investigation under the Internal Revenue Service's Tax Preparers Project, respondent clearly belongs to a highly selective group under some suspicion of wrongdoing. The Project applies to only a small percentage of all individuals who offer services to the public in preparing tax returns. Excluded are certified public accountants, attorneys, and those who hold Treasury cards. Of those within the Project's purview, only a small proportion—some 32 out of the total in this state—are singled out for the kind of inquiry to which respondent is subject. They are generally selected for such investigation by Internal Revenue Service "shopping," a practice by which an agent posing as a customer requests preparation of a tax return on the basis of a standard set of data and evaluates the return for error or fraud.[4] Although the respondent may have been selected by some other means,[5] there can

4. *See* United States v. Turner, *supra*, where Internal Revenue Service officials testified that "shopping" is the "principal means of deciding to investigate whether the returns compiled by a tax preparer are accurate."

5. Neither petitioner nor respondent knows how respondent was selected for this stage of investigation. Agent Haddad testified that he thought respondent's name was sug-gested by "an I.R.S. employee" in the "Office Audit Branch."

Respondent is a licensed public accountant under the laws of the State of Connecticut, C.G.S.A. § 20–280 et seq., and has maintained an office in Danbury for the practice of accounting for approximately eighteen years. He does not classify himself as a "tax preparer," and his accounting practice consists primarily of servicing approximately

be no doubt that he is in a group under strong suspicion of having erroneously and perhaps fraudulently increased exemptions, grossly exaggerated deductions, and omitted taxable income from clients' returns.[6] Indeed, the I.R.S. Manual Supplement outlining the Project refers to individuals in this group as "suspected preparers." Department of the Treasury, I.R.S. Manual Supplement, Tax Return Preparers Project, §§ 4.-01(1), 5.01(1), 6.02(1) (June 30, 1972).

The Government argues that this group's activity is not "inherently criminal" and that the compelled disclosures do not by themselves implicate respondent in any criminal conduct. In the Government's view, the Tax Preparer's project is a neutral, regulatory scheme, and the Internal Revenue Service's purpose noncriminal, so that compelling disclosure here no more abridges the Fifth Amendment privilege than compelling the filing of income tax returns.

This argument, however, excessively minimizes the mission articulated by the Internal Revenue Service itself—"to help eliminate return preparers fraudulent practices," Manual Supplement, *supra*, § 2.02—and the permeation of this project with investigative and prosecutorial purpose. The Manual Supplement provides in elaborate detail for screening and sampling of clients' returns, review of the tax preparers' personal returns, and coordination among sections of Internal Revenue Service offices—all with the explicit aim of apprehending those involved in criminal practices. The list of respondent's customers taken alone does not involve admission of an offense, but such disclosures may well "forge links in a chain of facts imperil-

ing" respondent with discovery of fraudulently prepared returns and consequent prosecution and conviction. Hoffman v. United States, *supra,* 341 U.S. at 488, 71 S.Ct. 814, 95 L.Ed. 1118; United States v. Burr, In Re Willie, 25 Fed.Cas. 38, 40 (No. 14,692e).

If disclosure is compelled, any differences between the lists for 1970 and 1971, and the one for 1972 already available to petitioner, may lead the Government to focus its investigation on particular returns, obviating the need for sampling. Respondent thus will be compelled in effect to "shoulder the load," properly borne by the Government, of ferreting out the lists from its own files. Murphy v. Waterfront Commission, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); 8 Wigmore, Evidence, § 2251 at p. 317 (McNaughton rev. 1961). Respondent's disclosure of the lists is an admission essentially different from the neutral act of disclosing one's own name and address, California v. Byers, *supra,* 402 U.S. at 432, 91 S.Ct. 1535, 29 L.Ed.2d 9, or producing "real or physical evidence," Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Additional facts in this case strongly support respondent's constitutional claims. Respondent's 1970 tax return is currently being audited for a possible failure to report $15,000 of taxable income. His return for 1971 is also under examination. Although the Government denies any connection between these audits and the request for the list of customers in those years, the focus of the Internal Revenue Service investigation on a discrepancy between his 1970 reported income and the income reflected

---

one hundred accounts, but he prepared approximately 1500 tax returns for each of the years 1970 and 1971.

6. Although the stages or types of investigation are not precisely delineated by the Manual Supplement, Internal Revenue Service Agent Haddad testified that the next step in the examination of respondent's returns would be a "sampling" of fifty to sixty for possible increased exemptions, grossly exag-

gerated deductions, or omitted income. Respondent would thus seem to have been brought at least to the stage outlined by § 5 (Audit Plans for Examining Preparer Returns). This section directs *inter alia* "[e]xamination of a *sample* of returns (clients) filled out by each *suspected* preparer to determine potential fraud, revenue yield and effect on voluntary compliance . . . ." § 5.01(1) (Emphasis added).

by his bank accounts clearly increases the hazards of self-incrimination resulting from the compelled disclosure of his customer lists, which are obviously evidence of his income. In the interview to which he was summoned, respondent was a target of the investigation and potentially a defendant in a criminal action, *cf.* Marcello v. United States, 196 F.2d 437, 441 (5th Cir. 1952).

Under the circumstances here, with the Tax Preparers Project in the background and the investigation of respondent having reached a serious stage, the list by itself thus confronts him with substantial hazards of self-incrimination. California v. Byers, *supra*, 402 U.S. at 429, 91 S.Ct. 1535, 29 L.Ed.2d 9. Prosecution is more than a "possibility."

It may be, as the Government contends, that the Project has other purposes besides the apprehension of fraud, and that respondent's list will be used to investigate wrongdoing by others besides himself. But the hazard of self-incrimination is not reduced by the possibility that the Government may *choose* not to employ this information against respondent, or that petitioner has the *option* of putting it to alternative uses. The existence of such alternative uses is relevant only to the assessment of the other portion of the *Byers* balance, public need for the information.

With respect to public need, denying enforcement of the summons hardly disables the Government from accomplishing any of its purposes here. The information sought by compelled disclosure may be obtained for all practical purposes by other methods. The list of respondent's 1972 customers may be compiled, as the Government acknowledges, by the comparatively simple and costless procedure of feeding his identification number into a computer that stores the relevant information. The vast majority of names on the 1970 and 1971 lists would be included on the 1972 list, since some 75 or 80 percent of his clientele is repeat business. While this method would not yield a full list of the 1970 and 1971 customers, it would permit the desired sampling of the returns prepared in those years. It would enable the Government to decide, depending on the extent of error or fraud revealed in those returns, whether to expend the substantial energy and resources required to search its own files to obtain the full lists for 1970 and 1971. Finally, it would almost certainly enable the Government to detect evasion in customers' returns, and collect the taxes due. There is no reason to believe that evasion occurred exclusively among the 1970 and 1971 customers who did not use respondent to prepare their 1972 returns, or even to a greater extent in that group than among those who did use his services for 1972 returns. Respondent could be prosecuted for any illegal practices revealed by the returns available from the 1972 list. And the Government's general policies—"to help eliminate return preparers' fraudulent practices, prevent victimization of uneducated and uninformed individual taxpayers and to increase compliance by taxpayers . . ." Manual Supplement, *supra*, § 2.02—would also be well served by this method.

Balancing the public need against the risks to respondent of self-incrimination, the claim of privilege must prevail as to the particular disclosures sought in the circumstances of this case. These circumstances are distinguishable from those upholding disclosure in other cases involving this or other Government programs. In United States v. Turner, *supra*, the Manual Supplement was apparently not before the Court, and there was no consideration of the prosecutorial purpose expressed therein. Nor was an assessment made of the Government's capacity for obtaining the information from sources such as this respondent's 1972 list, perhaps because respondent in *Turner* did not claim the same degree of repetition among customers. The holding in *Turner* was no doubt substantially determined by the lower court's finding that the Government lacked "any reasonable or practical means . . . with which to compile this in-

formation." United States v. Turner, No. 72C 3195 (N.D. Ill. Feb. 27, 1973). Lower court decisions following *Turner* have involved comparable factual determinations.[7] *E. g.*, United States v. Haley, No. 73–CV–39 W 3 (W.D.Mo. July 10, 1973); United States v. Kahn, 373 F.Supp. 145 (W.D. Mo. July 5, 1973); United States v. Justice, No. 73–70 (S.D. Ohio Mar. 19, 1973). The compelled disclosures upheld in other cases were fundamentally different in nature, *e. g.*, Securities Exchange Commission v. Radio Hill Mines Co., Ltd., 479 F.2d 4 (2d Cir. 1973) (reporting of ownership and transactions of securities); United States v. Rios-Gonzalez, 450 F.2d 1213 (2d Cir. 1971) (declaration of articles brought into the United States). The reporting requirements there were found to be in an area of inquiry that was noncriminal and regulatory. Securities Exchange Commission v. Radio Hill Mines Co., Ltd., *supra*, 479 F.2d at 7; United States v. Rios-Gonzalez, *supra*, 450 F.2d at 1216.

 Enforcement of the summons in the circumstances of this case would be contrary to important policies and purposes of the Fifth Amendment privilege. Respondent would be forced to aid the Government in its investigation against him. In the long run, compelling such aid would undercut the effectiveness of the Government's own investigative machinery by encouraging excessive reliance on self-reporting, California v. Byers, *supra*, 402 U.S. at 450, 91 S.Ct. 1535, 29 L.Ed.2d 9 (Harlan, J., concurring), a technique best reserved for collection of revenue, not detection of wrongdoing.

Accordingly, petitioner's motion to enforce this summons is denied, and respondent's motion to quash the summons is granted.

---

7. In United States v. Theodore, 479 F.2d 749 (4th Cir. 1973), also relied on by petitioner, the claim of privilege with respect to certain records was denied. But the records there were *corporate* records, and the claim of privilege was made on behalf of the corporation. The Court held that the privilege against self-incrimination is a purely personal one that cannot be invoked by or on behalf of a corporation or professional associa-

tion, United States v. Theodore, *supra*, 479 F.2d at 753 & n. 4, and that corporate records held by Theodore could not be the subject of the privilege even though "production of the papers might tend to incriminate him." United States et al. v. Theodore, 347 F.Supp. 1070 (D.S.C.1972). Respondent here makes a clearly personal claim, and no corporation is involved.