UNITED STATES of America, Appellee,

v.

Elbert Roscoe WALDEN and Raeford Thomas Walden, Appellants.

No. 12849.

United States Court of Appeals Fourth Circuit.

Argued March 4, 1969.

Decided June 10, 1969.

John Randolph Ingram, Asheboro, N. C., (Court-appointed counsel), for appellants.

H. Marshall Simpson, Asst. U. S. Atty. (William H. Murdock, U. S. Atty., on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, and CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

■ Appellants Walden and Walden (no kin) were indicted on two counts in a North Carolina district court for violations of provisions of the Internal Revenue Code requiring the bonding of a distillery and designation of the place of manufacture. After an unsuccessful motion to dismiss the indictment on the ground that furnishing the required information and providing a bond would have incriminated them, the Waldens were convicted on September 23, 1968. In seeking reversal, they rely on Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), Grosso v. United States, 390 U.S. 62, 88 S.Ct. 716, 19 L.Ed.2d 906 (1968), and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). We must therefore decide whether those cases extend the protection of the Fifth Amendment privilege against self-incrimination as a defense to charges of violating certain provisions of the distilled spirits taxing statutes. Deciding the question against appellants, we hold that the *Marchetti-Grosso-Haynes* rationale is not applicable to invalidate enforcement of these statutes, and affirm.

The indictment charged the Waldens in count one with violating 26 U.S.C. §§ 5173 and 5601(a) (4) by carrying on the business of distillers without having given bond, and in count two with violating 26 U.S.C. §§ 5222 and 5601(a) (7) by making and fermenting mash on premises other than those lawfully designated. In their motion to dismiss the indictment, the defendants urged that the statutes were unconstitutional as an abridgment of the privilege against self-incrimination. The possibility of incrimination was said to spring from North Carolina's total prohibition of the manufacture of liquor within the state, its proscription of keeping liquor for sale "except as otherwise authorized by law," and its statutory presumption from possession of a federal license [1] to manufacture spirituous liquors that violation of the state laws is occurring. N.C.G.S.

---

1. The record does not disclose the requisites for a "license" or the practice of issuance. Since appellants and the government assume one would have issued upon compliance with the statutes upon which indictment was based, we do likewise for present purposes.

§§ 18–28, 18–32, 18–35. Therefore, claim appellants here, registration[2] of their distillery and the giving of the bond required by the federal statutes would have incriminated them under North Carolina law "for the reason that they would have been furnishing evidence which would have been available to authorities of the State of North Carolina to be used as evidence against them in the Criminal Courts of that state."

■ Appellants contend for the broad proposition that "the true question is whether the statute inflicts punishment upon an individual for his failure to incriminate himself." We find such a test too broad. There is no constitutional guarantee against being required to provide information from which it *might* be determined that some legal violation has occurred. *See* Marchetti v. United States, 390 U.S. 39, 44, 88 S.Ct. 697, 19 L.Ed.2d 889, *citing* License Tax Cases, 5 Wall. 462, 18 L.Ed. 497. The privilege against self-incrimination assures, rather, that one may not be compelled to provide information which would provide a " 'real and appreciable' " and not merely " 'imaginary and unsubstantial' " hazard that a significant " 'link in a chain' " of evidence would be established to prove guilt. *Marchetti, supra* at 48, 88 S.Ct. 697. Where there is no real danger, there is no privilege. Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

*Marchetti-Grosso-Haynes* held that a Fifth Amendment defense may successfully be raised where statutes are directed at a small number of people who are inherently suspect of illegal activities, where the activities required to be reported on are almost certain to be illegal because the general area of activity is permeated with criminal statutes. The distilled spirits taxing statutes, however, apply not to a select few persons, but to many persons,[3] who engage in activities from production to retail sale of distilled spirits. Furthermore, the activities required to be reported on are not almost certain to be illegal, but are most often legal as the sale of liquor in some form is permitted in all 50 states and the District of Columbia, and production of distilled spirits is permitted in all but a few states. In contrast, wagering, the tax on which was challenged in *Marchetti* and *Grosso*, is legal only in Nevada, and even there not all forms of gambling are legal. The characteristics of the statutes condemned in *Marchetti-Grosso-Haynes* seem to us quite different from those of the statutes here under attack. Cf. United States v. Buie, 407 F.2d 905 (2d Cir., March 12, 1969) (conviction affirmed for sale of marihuana without a federally required written order form); Heligman v. United States, 407 F.2d 448 (8th Cir., March 5, 1969) (conviction affirmed for failure to file corporate income tax return); United States v. Minor, 398 F.2d 511, 516 (2d Cir., 1968) (conviction affirmed for sale of narcotics without a federally required written order form). These liquor taxing statutes fall within the ambit of "regulatory programs of general application" which the Court specifically recognized as immune from this form of Fifth Amendment challenge. *Haynes, supra*, 390 U.S. at 98, 88 S.Ct. 722.

In United States v. Ulrici, 111 U.S. 38, 40, 4 S.Ct. 288, 289, 28 L.Ed. 344 (1884), the Court stated:

"It is clear, even upon a cursory reading, that the well considered and minute provisions of the Revised Statutes found in chapter 4, entitled * * 'Internal Revenue,' were adopted with one purpose only, namely, to secure the payment of the tax imposed by law upon distilled spirits.

"All the regulations for the manufacture and storage, the marking,

---

2. The record below and the briefs on appeal do not distinguish between failure to "register" and the activities proscribed by the statutes alleged to have been violated here. We assume for purposes of decision that they are the same.

3. In 1966 there were 13,105 licenses for operations relating to alcoholic beverages issued by the Treasury Department.

branding, numbering, and stamping with tax stamps of distilled spirits, and all the penalties, forfeitures, fines, and imprisonments prescribed by the chapter mentioned, have that end only in view."

In 1966, the taxes on distilled spirits produced $3.7 billion in internal revenue. The wagering tax scrutinized in *Marchetti* produced "in the past several years" only $115 million.[4] 390 U.S. at 82, 88 S.Ct. at 721.

We think the failure of these defendants to designate place of manufacture and to post a distillery bond is due to their wish to avoid the federal tax of $10.50 per gallon on distilled spirits. The evasion of tax alone provides the enormous margin of profit in the white whiskey business and accounts for the delinquency here. It lies well within the power of Congress to exercise a regulatory function to enforce the collection of such lawfully due taxes.

For us the dispositive consideration on the inapplicability of the *Marchetti* rationale to this case is that the Supreme Court's decisions in those cases were undoubtedly responsive to what was felt to be the oppressiveness of the statutes and their application. As the Court said in *Marchetti*, "[t]he terms of the wagering tax system make quite plain that Congress intended information obtained as a consequence of registration and payment of the occupational tax to be provided to interested prosecuting authorities. * * * This has evidently been the consistent practice of the Revenue Serv-

ice." 390 U.S. at 58–59, 88 S.Ct. at 708. This contemplated transfer of information thus apparently convinced the Court that there existed a substantial hazard that a "link in a chain" of evidence establishing guilt would be forged by compliance.

Here the "chain" of evidence is not so readily discernable and it is not established in this case that it exists.[5] We note that this liquor case was "made" by Randolph County, North Carolina, officers who then brought in agents of the Alcohol and Tobacco Tax Unit of the United States Treasury Department who made a federal case of it. Such state-federal cooperation is not infrequent. The usual result is a single prosecution in the federal court with no prosecution proceeding in the state court. The practice is so well established that whenever over-zealous officers may occasionally press dual prosecutions the judges of both state and federal courts in North Carolina are alert to prevent it, and as a matter of comity, one court ordinarily will defer to the other to assure that there is not double punishment.

But concededly, had the Waldens' still been discovered because of their compliance with federal statutes, and had its existence and location been brought to the attention of state officers by federal officers, state prosecution would presumably have resulted. However, unlike the situation in *Marchetti*, the record does not suggest a practice nor a congressional purpose of making available to state officers the information obtained.

---

4. "The constitutional issues in the wagering tax cases are important; but the revenue the wagering taxes produce is not. Excise taxes of all kinds produced $14.5 billion in fiscal 1965. The wagering taxes, however, are not a significant part of the total, ranging from $10.5 million in the first year of collection, fiscal 1953, to $6.6 million in fiscal 1965, despite original estimates of $400 million a year. Is it not likely that the only reason for continuance of such taxes, whose collection costs may exceed the revenue produced, is congressional desire to force gamblers to confess themselves into conviction of

state crimes or to risk conviction for the federal crimes of nonpayment of taxes and nonregistration?" McKay, Self-Incrimination and the New Privacy, 1967 Sup.Ct. Rev. 193, 233 (footnotes omitted).

5. Unlike *Marchetti*, *Grosso* and *Haynes*, designating the place of manufacture and furnishing a distiller's bond would not have invited *federal* criminal prosecution. To the United States Attorney a nontax-paid liquor case is simply a tax case. If a distillery is bonded to protect the collection of taxes that is probably the end of the matter on the criminal side of the docket.

Doubtless the Waldens failed below to establish any such practice for the reason that distilleries in North Carolina are simply never registered with the Internal Revenue Service. Absent proof of such a practice, or at the very least, proof of purpose of federal agents to report still registrations to state prosecuting authority, appellants Walden fail to establish that they would have been substantially endangered by compliance with the federal statutes. That alone distinguishes *Marchetti-Grosso-Haynes.*

In *Marchetti,* 390 U.S. at 59, 88 S.Ct. 697, and *Grosso,* 390 U.S. at 66, 88 S.Ct. 716, Mr. Justice Harlan noted that those under a statutory duty to report their activities might reasonably expect that both federal and state prosecuting authorities would be proffered the information. In his concurring opinion in *Marchetti* and *Grosso,* Mr. Justice Brennan suggested that it was the statutory purpose to "coerce evidence from persons engaged in illegal activities for use in their prosecution" that flawed the statutes under examination. 390 U.S. at 74, 88 S.Ct. at 717. We perceive no such statutory or agency purpose here. In short, it evidently appeared to the Court in *Marchetti-Grosso-Haynes* that self-incrimination was affirmatively sought by statutes which had relatively little other reason for existence. Here, the statutes' reason for existence is the regulation of a large legal industry, and the protection of a very substantial source of federal revenue.

In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (May 19, 1969), the Supreme Court has reaffirmed the tests enunciated in *Marchetti-Grosso-Haynes.* In invalidating Leary's conviction for violations of two federal statutes governing traffic in marijuana, the Court considered first the Marijuana Tax Act, 26 U.S.C. § 4741 et seq. After observing that possession of marijuana was a crime in all 50 states, the Court noted that generally excepted categories of persons who might legally possess it were either virtually certain to be properly registered, or were wholly exempt

from the requirement of obtaining and filing a transfer order form. Therefore,

"the class of possessors [of marijuana] who were [as Leary was] both unregistered and obliged to obtain an order form constituted 'a select group inherently suspect of criminal activities.' Since compliance with the transfer tax provisions would have required petitioner unmistakeably to identify himself as a member of his 'select' and 'suspect' group, we can only decide that when read according to their terms these provisions created a 'real and appreciable' hazard of incrimination." 395 U.S. 18, 89 S.Ct. 1538, 1539.

Additionally, the Court noted that

"Sections 4741–4742 required him, in the course of obtaining an order form, to identify himself not only as a transferee of marijuana but as a transferee who had not registered and paid the occupational tax under §§ 4751–4753. *Section 4773 directed that this information be conveyed by the Internal Revenue Service to state and local law enforcement officials on request.*" 395 U.S. 16, 89 S.Ct. 1537. (Emphasis added.)

The Court thus appeared to find that the pertinent sections of the Marijuana Tax Act were aimed at identifying those who illicitly traffic in the drug, with a substantial likelihood that such information would be presented to interested state prosecuting authorities. As such was also the purpose of the statutes considered in *Marchetti-Grosso-Haynes,* we think *Leary* represents an application, and not an extension, of those cases. We believe our disposition here, affirming these convictions, to be entirely consistent with *Leary.*

Having decided that the result in this case is not to be controlled by *Marchetti-Gross-Haynes,* we further decide that on no other basis can we say that the statutes here under attack are such that the Fifth Amendment should be a defense to charges of noncompliance. Still viable

after *Marchetti* and its associated cases are United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), and Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), concerned with what is referred to as the "required records" doctrine.

In *Sullivan,* the Court held that a taxpayer was not privileged to refuse altogether to file an income tax return because part of his income derived from illegal activities. The Court observed that what information, if any, the taxpayer might have withheld was not a question for decision. However, where most of the questions were innocuous, "[i]t would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime." 274 U.S. at 263–264, 47 S.Ct. at 607.

In *Shapiro,* the Court affirmed a conviction for violations of the Emergency Price Control Act, where the evidence of violations was searched out after compelling the production of petitioner's records required to be kept under the Act. Though the records were labeled as "public" in nature, the thrust of the decision is that

> "no serious misgiving that those [constitutional] bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator." 335 U.S. at 32, 68 S.Ct. at 1392.

The Court further held that *enforcement* of validly established regulations was a suitable purpose for requiring the records.

Apparently crucial to the Court's decision that *Sullivan* and *Shapiro* did not control the results in *Marchetti-Grosso-Haynes* was the determination that the purposes of the United States' inquiry in *Sullivan* and *Shapiro* were essentially regulatory, and the statutes in *Marchetti* and its associated cases plainly were not. The distilled spirits statutes here do not technically involve the "required records" doctrine, in that here it is not required that one preserve and make available for government inspection records of a kind which he has customarily kept. Nonetheless, we think that the Court's concern with distinguishing between those statutes "essentially regulatory" and those seeking primarily to compel incriminating disclosures, *see Grosso, supra,* 390 U.S. at 68, 88 S.Ct. 716, is manifested adequately to compel our conclusion that the statutes here, being essentially regulatory in nature in that they are designed to enforce and protect the collection of substantial federal revenue, fall into the category of those constitutionally approved in *Shapiro* and *Sullivan,* as distinct from those condemned in *Marchetti-Grosso-Haynes. See Haynes, supra,* 390 U.S. at 98–99, 88 S.Ct. 722.

The rationale underlying the constellation of Supreme Court cases interpreting the extent of the Fifth Amendment protection against self-incrimination is not free from questions of great complexity. *See generally,* Mansfield, The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information, 1966 Sup.Ct.Rev. 103. Undoubtedly, however, that rationale recognizes the validity of governmental requests for information needed in the good faith pursuit of governmental powers and obligations to tax and to regulate commerce. Though there is sometimes a direct conflict between the policy of the privilege and the satisfaction of those various governmental interests, the Supreme Court appears thus far to have resolved this conflict in favor of satisfying the governmental interests unless a statutory request for information affirmatively contemplates and seeks self-incrimination of the class to whom the

request is directed. Compare Shapiro v. United States, *supra,* and United States v. Sullivan, *supra,* with Marchetti v. United States, *supra,* Grosso v. United States, *supra,* Haynes v. United States, *supra,* and Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

Because we conclude that no such purpose underlies the statutes here, and further because it has not been shown that substantial danger of prosecution would result from compliance with these statutes, we affirm these convictions. *Accord,* United States v. Richardson, 284 F.Supp. 419 (M.D.Ala.1968); United States v. McGee, 282 F.Supp. 550 (M.D.Tenn.1968). *See also* Shoffeitt v. United States, 403 F.2d 991 (5th Cir., Nov. 25, 1968).

Affirmed.