# Richmond

James Harlen Ford, sometimes known
as James Harold Ford v. Common-
wealth of Virginia.

October 14, 1974.

Record No. 730676.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Poff, JJ.

*F. Bruce Stewart* for plaintiff in error.

*James E. Kulp, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

Poff, J., delivered the opinion of the court.

James Harlen Ford, sometimes known as James Harold Ford, was convicted by the trial court, sitting without a jury, under an indictment charging that on October 13, 1972 he "unlawfully did have in his possession a 'sawed-off' shotgun for offensive or aggressive purpose" in violation of Code § 18.1-268.3 (Cum. Supp. 1974).[1] By final judgment order entered April 16, 1973, the trial court imposed a penalty of 10 years in the penitentiary to run concurrently with another sentence imposed the same day upon a November 3, 1972 conviction of a malicious wounding offense committed January 7, 1972.

Just before midnight, October 13, 1972, at Courtland Recreation Center where a dance was in progress, a group of undetermined number was assembled in the parking lot watching two young men, Pete Whitfield and Larry Wrenn, who

---

[1] Insofar as relevant, the "Sawed-Off Shotgun Act" reads as follows:

"**§ 18.1-268.3. Possession or use of 'sawed-off' shotgun for offensive or aggressive purpose.** — Unlawful possession or use of a 'sawed-off' shotgun for an offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

"**§ 18.1-268.4. What constitutes offensive or aggressive purpose.** — Possession or use of a 'sawed-off' shotgun shall be presumed to be for an offensive or agressive purpose:

(1) When the 'sawed-off' shotgun is found in the possession of an individual at the scene of a riot or civil disturbance, unless such possession is on premises owned or rented by the individual for residential, recreational or business purposes and obviously for defense of his person, family or property during such riot or civil disturbance;

(2) When the 'sawed-off' shotgun is in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions;

(3) When the 'sawed-off' shotgun is of the kind described in § 18.1-268.1 and has not been registered as required in § 18.1-268.8 [§ 18.1-268.7]; or

(4) When the 'sawed-off' shotgun is found in the possession of an individual under circumstances indicating his preparation to participate in a riot or civil disturbance or his preparation for the commission of a crime of violence.

"**§ 18.1-268.7. Registration of 'sawed-off' shotguns.** — Every 'sawed-off' shotgun in this State shall be registered with the Department of State Police within twenty-four hours after its acquisition. . . . To comply with this section the application as filed shall be notarized and shall show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. . . ."

were arguing and wrestling. Among the group were James Ford, Ronald Whitney (who was also engaged in argument with Wrenn), and Whitney's brother. Ronald Whitney testified, "I did hear my brother say, go on James I ain't got nothing else to say, like that." Ford left, but the record does not show where he went. However, a short time later, Ronald Whitney also left and, after driving one and one-half miles, met Ford returning to the parking lot.

Just after midnight, David Price, a deputy sheriff off-duty, stopped by the center to talk with Joseph Harris, Sr., a special policeman in attendance at the dance. Harris assured him that there had been no "disturbance" at the dance. As the two officers were walking to Price's car, they heard a "commotion" near the light in the parking lot. Price testified that "some type of argument" was in progress which "ceased as we approached". Price saw Ford standing behind three young men and noticed that he was holding a "sawed-off" shotgun at his side with the muzzle pointed at the ground. Price said that he "called to the defendant and asked what he was doing with the gun, and told him he didn't need it there, and he made about two steps backwards and he turned and ran off in the dark towards the bushes". Ford returned a few minutes later and, when asked for the shotgun, denied that he had one. Price ordered Ford from the premises and, using a flashlight and the headlights of his car, began searching the area into which Ford had fled. During the search at approximately 1:00 a.m., Price came upon Ford near the edge of a road "looking down like he was looking for something". Nearby, Price found a "sawed-off", 12-gauge shotgun which he carried to the sheriff's office and impounded. Ford was not arrested until 6:00 p.m. that afternoon. No other arrests were made on account of anything which occurred at the parking lot that night.

Price found no shells in the shotgun, in the area where it was discovered, in the parking lot, or on Ford's person. Other Commonwealth witnesses testified that the shotgun was operable and that the state had no record of its registration in Ford's name.

Ford testified that he had purchased the shotgun for $20 from an unidentified "dude" in a poolroom about 5:30 p.m. on October 13, 1972; that he placed it in the trunk of his car; that when he stopped by the parking lot after attending a football game, he

took it out to show to two friends; that he knew it was "illegal" and was unaware of the 24-hour registration grace period; and that when Price saw him holding it, he "panicked" and ran because he was "already out on bond".

■ Assigning error to the trial court's rulings against his pretrial motion, his motion to strike the Commonwealth's evidence, and his motion to set aside the "verdict" and relying on *Haynes* v. *United States*, 390 U.S. 85 (1968), and *Riley* v. *Commonwealth*, 213 Va. 273, 191 S.E.2d 727 (1972), Ford argues first that "the registration required by Section 18.1-268.7 of the Code of Virginia violates...[his] privilege against self-incrimination."

In *Riley* v. *Commonwealth*, 213 Va. 273, 276, 191 S.E.2d 727, 730 (1972) we said:

"In the case at bar, Riley did not assert his constitutional privilege against self-incrimination in the court below. In our view the registry provisions of § 18.1-268.7 are not unconstitutional per se. The General Assembly may restrict the possession or use of a 'sawed-off' shotgun by requiring its registration with law enforcement authorities, and constitutional objections may be met by a proper assertion of a claim of privilege."

Here, the claim was timely asserted, exception was properly preserved, and error was specifically assigned. Having already decided that the registry provisions are facially constitutional, we must now decide whether application of those provisions to Ford violated the privilege he claims. More precisely, we must consider whether application of those provisions compelled Ford to furnish information which, if furnished, tended to incriminate him.[2]

"Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly." *California* v. *Byers*, 402 U.S. 424, 427 (1971).

The privilege against self-incrimination does not reach to

---

[2] For the information required of registrants, see footnote 1.

every hazard the registration requirement might conceivably pose. The standard is whether the requirement "created for petitioner 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination", *Marchetti* v. *United States*, 390 U.S. 39, 48 (1968), or "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." 390 U.S. at 53.

Against that standard, we test the merit of Ford's claim. Ford says that the registration requirements of Code § 18.1-268.7 expose him, first, to substantial hazards of prosecution under Code §§ 18.1-268.3, -268.4, and, second, to substantial hazards of prosecution under federal law.

In *Haynes* v. *United States*, 390 U.S. 85 (1968), upon which Ford principally relies, the Supreme Court was concerned with the hazard, posed by registration under the old National Firearms Act, that registrants would be prosecuted for violations of other sections of that Act. Upholding the defendant's claim of privilege against self-incrimination, Mr. Justice Harlan found that "the correlation between obligations to register and violations can only be regarded as exceedingly high, and . . . it can scarcely be said that the risks of criminal prosecution confronted by prospective registrants are 'remote possibilities out of the ordinary course of law ' ". 390 U.S. at 97.

So far as Ford is concerned, we find in the Sawed-Off Shotgun Act no such correlation between the obligation to register and violations of its criminal provisions. Only one of the four presumptions created by Code § 18.1-268.4 is activated by the act of registration; under Code § 18.1-268.4(2), if, at the time of registration, the registrant is "an unnaturalized foreign-born person" or if, prior to registration, he "has been convicted of a crime of violence", possession of a sawed-off shotgun is "presumed to be for an offensive or aggressive purpose." The very act of registration establishes the fact of possession, and the registration records reflect the name and address of the possessor. If law enforcement authorities routinely cross-check that data against other records available to them to determine whether the registrant is a person named in Code § 18.1-268.4(2) (a practice the evidence does not establish), a prospective registrant would have standing to argue that the registration requirements subject him to a substantial hazard of prosecution under Code § 18.1-268.3 in violation of his privilege against

self-incrimination. We do not decide that question. It is not before us. Ford was not such a person and has no standing to complain of such a hazard.

But Ford argues that registration "would facilitate the investigation and prosecution of the defendant under Section 18.1-268.3 if, subsequent to registration, he were convicted of a crime of violence", thus activating the presumption created by Code § 18.1-268.4(2). In fact, subsequent to the date registration was required, Ford was convicted of a crime of violence committed before that date. But even if Ford had registered his shotgun, the incriminating presumption would not have arisen and Ford would not have been exposed to a hazard of prosecution under Code § 18.1-268.3 if he were acquitted of the crime of violence or if, before conviction of the crime of violence, he had dispossessed himself of the shotgun. Such a contingent hazard, one which Ford himself had the power to prevent, is not a substantial hazard.

Nor are we impressed with the self-incrimination argument that registrants of "sawed-off" shotguns are members of a select and suspect class likely to commit future crimes and that their identification in registration records exposes them to a conspicuous hazard of investigation and prosecution for such crimes. Ford relies upon the comment in *Marchetti* v. *United States, supra,* 390 U.S. at 54, that "[p]rospective registrants can reasonably expect that registration ... will significantly enhance the likelihood of their prosecution for future acts, and that it will readily provide evidence which will facilitate their convictions." That comment must be viewed in light of the statement which preceded it that "the acquisition of a federal gambling tax stamp, requiring as it does the declaration of a present intent to commence gambling activities, obliges even a prospective gambler to accuse himself of a conspiracy to violate either state gambling prohibitions, or federal laws". 390 U.S. at 52-53. Also instructive is the sequent statement in the same paragraph from which Ford quotes that "[i]nsubstantial claims of the privilege as to entirely prospective acts may certainly be asserted, but ... they need only be considered when a litigant has the temerity to pursue them." 390 U.S. at 54.

Guided by the following language of Mr. Justice Douglas in a

more recent opinion, we hold that the claims Ford has pursued are "insubstantial":

"Appellees' argument assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation." *United States* v. *Freed*, 401 U.S. 601, 606-7 (1971).

We turn now to Ford's argument that the registration requirement exposes him to the hazard of prosecution under federal law. As he points out, it is a violation of federal law for a person "to receive or possess a firearm which is not registered to him" by the person from whom he acquired it. 26 U.S.C. § 5861(d). Assuming that Ford was guilty of such a violation, the question remains whether registration under the Virginia Act would have exposed him to a "real and appreciable" hazard of prosecution for that violation. In *Marchetti* v. *United States, supra; Grosso* v. *United States*, 390 U.S. 62 (1968); *Haynes* v. *United States, supra;* and *Leary* v. *United States*, 395 U.S. 6 (1969), the registration or tax information required by the federal laws was, as a matter of Congressional purpose or as a matter of administrative practice, disclosed to federal or state law enforcement authorities, and the Supreme Court held that such disclosures exposed the registrant or taxpayer to a substantial hazard of prosecution under federal or state laws.

Where there is no such purpose or practice, those cases do not control. *United States* v. *Walden*, 411 F.2d 1109 (4th Cir. 1969), *cert. denied*, 396 U.S. 931 (1969). In *Walden*, the defendants claimed that federal registration of their distillery would have incriminated them under state law which prohibited the manufacture of all liquor. Although the federal alcohol tax laws were silent as to dissemination or suppression of registration information, the court said:

"However, unlike the situation in *Marchetti*, the record does not suggest a practice nor a congressional purpose of making available to state officers the information obtained. . . . Absent proof of such a practice, or at the very least, proof of purpose of federal agents to report still registrations to state

prosecuting authority, appellants Walden fail to establish that they would have been substantially endangered by compliance with the federal statutes. That alone distinguishes *Marchetti-Grosso-Haynes.*" 411 F.2d at 1112-13.

*See also United States* v. *20 "Dealer's Choice" Mach. & C. Con. of $3.50,* 483 F.2d 474 (4th Cir. 1973).

Except for the provision in Code § 18.1-268.7 that "registration data shall not be subject to inspection by the public", the Sawed-Off Shotgun Act is silent as to dissemination or suppression of that data. As in *Walden,* nothing in the record reveals any administrative practice of disclosing that data to the law enforcement authorities of another sovereign. From this record, we hold that the registration requirements of the Act did not expose Ford to a substantial hazard of federal prosecution.

Finding no merit in Ford's claim that the registration requirements violate his privilege against self-incrimination, we consider next whether the evidence is sufficient to raise any of the presumptions created by the four subsections of Code § 18.1-268.4.[3]

As to the first and second presumptions, the Commonwealth concedes on appeal that the evidence is insufficient and relies on the third and fourth.

As to the third, Ford contends that the evidence was insufficient to support the presumption raised by non-registration because there was no proof that the weapon introduced as an exhibit was a " 'sawed-off' shotgun" as defined by Code § 18.1-268.1. Since that question is raised for the first time on appeal, we do not notice it. Rule 5:7.

■ Ford further contends that the third presumption is not supported by the evidence because the Commonwealth did not prove that he possessed the shotgun longer than the 24-hour registration grace period, and therefore there was no proof of failure to register within the meaning of Code §§ 18.1-268.4(3), -268.7. The general rule is that when the defendant claims that he falls within an exception to a penal statute, he has the burden of proving that defense. *McKelvey* v. *United States,* 260 U.S. 353,

---

[3] In providing "an offensive or aggressive purpose", the Commonwealth is not restricted to but is only aided by the statutory presumptions. See *Boggs* v. *Commonwealth,* 212 Va. 658, 187 S.E.2d 204 (1972). But here the Commonwealth relies exclusively upon the presumptions.

357 (1922); *Devine* v. *Commonwealth*, 107 Va. 860, 864, 60 S.E. 37, 39 (1922). The logic of the rule is reinforced where, as here, the facts and circumstances underlying the exception (or grace period) are matters peculiarly within the defendant's knowledge. *See* C. Torcia, 1 *Wharton's Criminal Evidence* § 14 (21-23) (13th ed. 1972). Although Ford testified that he had acquired the shotgun for $20 from a "dude" in a poolroom and had possessed it only nine hours before it was taken from him, we cannot say that the trial court erred in disregarding that evidence as incredible.

Accordingly, we believe that the evidence was sufficient to show that Ford failed to register the shotgun as required by law and was, therefore, sufficient to raise the presumption created by Code § 18.1-268.4(3).

■ However, we hold that the evidence was insufficient to raise the presumption created by Code § 18.1-268.4(4), because it was insufficient to support a finding that Ford possessed the shotgun "under circumstances indicating his preparation to participate in a riot or civil disturbance or his preparation for the commission of a crime of violence."

The record shows that at the time Ford was seen in possession of the shotgun, there was no wrestling or other physical conflict in progress. What attracted the attention of the officers was a verbal altercation which ceased as they approached the group. They witnessed no conduct which prompted them to make an arrest for disorderly conduct, breach of the peace, or any other offense. But we need not decide whether a "riot" or "civil disturbance" was in progress or whether either was imminent, for we are of opinion that the evidence does not prove beyond a reasonable doubt "circumstances indicating" that Ford was preparing to participate in a riot or civil disturbance or to commit a crime of violence. Ford was seen standing in the group with the muzzle of the shotgun pointed at the ground. No shells were found in the shotgun, on Ford's person, or elsewhere. There was no evidence that Ford engaged in the verbal altercation or that he made any verbal threat or menacing gesture. Possession of a "sawed-off" shotgun under the circumstances disclosed by this record is not sufficient to show preparation to participate in unlawful conduct.

■ The record does not tell us upon what statutory

presumption the trial judge relied in finding Ford guilty. It may be that he relied upon the presumption created by Code § 18.1-268.4(3) which we have said the evidence supports. But it may be that he relied upon one of the other presumptions created by the statute. We cannot speculate at Ford's expense. As we said in reversing a jury conviction under this Act which may have been based upon an unsupported presumption, "it cannot be known upon which presumption the jury based its verdict." *Riley* v. *Commonwealth, supra,* 213 Va. at 277, 191 S.E.2d at 730. For the same reason, the judgment here must be reversed and the case remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*