# CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Hulett L. Hill

April 10, 2001

Case No. (Criminal) 85436

BY JUDGE STANLEY P. KLEIN

Defendant Hulett L. Hill moves the court to rescind its prior approval of polygraph testing as a special condition of his probation. Hill contends that this special condition is improper and unreasonably burdens his Fifth Amendment privilege against self-incrimination. After full consideration of the evidence, the arguments presented and the controlling authorities, the court denies Hill's motion for the reasons that follow.

## I. *Background*

On July 19, 1994, Hill entered a plea of guilty to the charge of Aggravated Sexual Battery. See Va. Code Ann. § 18.2-67.3. On September 16, 1994, after

consideration of the pre-sentence investigation report[1] and a Forensic Psychological Evaluation,[2] the court sentenced the Defendant to fifteen years in the penitentiary for the aggravated sexual battery of his 11-year-old daughter. The court suspended eight years of Hill's sentence and placed him on probation for three years upon his release from incarceration with several special conditions. The court ordered that Hill participate in drug counseling, have no contact with his daughter absent therapist approval, pay for his daughter's therapy, and abide by the other conditions of probation supervision. On November 1, 1994, the Defendant asked the court to reconsider the sentence rendered September 16, 1994; Hill requested the court to order his participation in a treatment program, which would help him "better understand, cope, and resolve the problems [he avoids] so deftly." The court denied Hill's Motion.

On February 22, 1999, after his release from prison and the commencement of his probationary period, Hill executed a document acknowledging his Conditions of Probation/Post Release Supervision[3] (Conditions of Probation) and a separate Sex Offender Program — Behavioral Contract[4] (Sex Offender Contract). Paragraph 6 of the Conditions of Probation required Hill to "follow the Probation and Parole Officer's instructions and to be truthful and cooperative." Paragraph 13 of the Sex Offender Contract noted that polygraph testing could be a component of Hill's therapy.

From April 28, 1999, through September 20, 2000, Hill received therapy from Fairfax County Mental Health Services. Hill also participated in a Men's Sex Offender Treatment Group from July 7, 1999, through April 26, 2000. On September 20, 2000, Hill's treatment group therapist and clinical psychologist, Fred Singer, Ph. D., informed Denise Hayes, Hill's probation officer, that Fairfax County was closing Hill's case. Singer recommended that Hayes "consider periodic evaluation using interview and polygraph assessment," in light of Hill's "substance abuse history, criminal record, and readiness to talk

---

[1] The pre-sentence investigation report indicated that the Defendant's criminal record was extensive. In addition, it included admissions of substance abuse problems by the Defendant.

[2] On September 2, 1994, the court granted the Defendant's Motion to undergo a Pre-Sentence Evaluation of Sexual Abnormality pursuant to § 19.2-300 of the Virginia Code. § 19.2-300 provides for the deferment of sentencing until a mental health evaluation may be conducted in any case involving conviction for any criminal offense that indicates sexual abnormality. See generally, *Simerly v. Commonwealth*, 29 Va. App. 710, 514 S.E.2d 387 (1999).

[3] Commw. Ex. 2.

[4] Commw. Ex. 1.

about criminal thoughts." See Letter from Singer to Hayes dated September 20, 2000.

Consistent with the policy established for the Fairfax Circuit Court by Chief Judge F. Bruce Bach in January 1999, Hayes sought the court's permission to administer a polygraph to Hill. By reply letter dated October 6, 2000, this court authorized polygraph testing in conjunction with Hill's treatment but withheld any opinion as to the admissibility of the results of any such testing in any court proceedings. Hayes then scheduled a polygraph for Hill, who had already reluctantly agreed to take the test. Prior to the administration of the polygraph, however, Michael Sprano, counsel for Hill, formally noted an objection to the test and filed a Memorandum of Law in Support of Defendant's Objection to Polygraph Testing as a Condition of Probation or Parole. Accordingly, the court scheduled a hearing for December 15, 2000.

At the hearing, the Commonwealth presented the testimony of Lisa Hunt, the Director of the Center for Clinical and Forensic Services (Center). Hunt testified that she had been working with sex offenders since the early 1990s and had contracted with the Virginia Department of Corrections to provide therapy for sex offenders being reintegrated into the community. According to Hunt, the Department of Corrections had revamped its program to oversee these offenders in 1999 by integrating polygraph testing into its "containment model." Hunt presently sees approximately one hundred sex offenders per week and utilizes polygraph testing by specially trained examiners who have been approved by the Department of Corrections. To date, the Center has administered over two hundred polygraphs. Hunt opined at the hearing that polygraph testing is an effective tool in breaking through the denial of many sex offenders because the testing ensures honesty, compliance, and accountability. At the Center, polygraph questioning generally centers on compliance with behavioral restrictions (i.e., court mandated no-contact-with-children or residential requirements) and the offender's sexual history, so that potential patterns of deviant behavior can be assessed.

At the conclusion of the hearing, Sprano argued that the court had established an impermissible condition of probation in authorizing polygraph testing for Hill. Although defense counsel conceded that polygraph testing "has a great utility in sex offenders' [treatment] particularly,"[5] Sprano contended that absent a specific grant of appropriate immunity, Hill's privilege against self-incrimination precluded the court from requiring Hill to answer any questions during a polygraph test. He argued that the special

[5] See Partial Tr. at 3.

condition authorized by the court presented his client with a "Hobson's choice"[6] of either (1) making statements that could potentially be used against him at a revocation hearing or in a new criminal proceeding, or (2) having his probation revoked for failing to cooperate with the directives of his probation officer.

The Commonwealth responded that Hill had no Fifth Amendment rights in the context of probationary supervision, as his privilege against self-incrimination had become complete at the moment his sentence was fixed by the court. The Commonwealth, in addition, argued that a special condition of polygraph testing was entirely appropriate, because Hill's probation officer had learned of allegations that Hill was viewing child pornography on the Internet, thereby causing a situation which potentially endangered the two children of the woman with whom Hill had established a relationship.

After the hearing, the court ordered counsel to submit briefs addressing the permissible scope of the invocation of an individual's right against self-incrimination. The court has now fully considered the parties' briefs and the relevant authorities.

## II. *The Commonwealth's Scheme of Sentencing and Probation*

In Virginia, although a jury may recommend a sentence, the ultimate responsibility to fix a sentence rests with a judge,[7] and only the court may suspend a sentence and/or place a defendant on probation. See Va. Code Ann. § 19.2-303.[8] Specifically, § 19.2-303 of the Code permits a court to suspend

---

[6] See *Doss v. Commonwealth*, 23 Va. App. 679, 687-88, 479 S.E.2d 92 (1996). In *Doss*, the defendant argued that a court order, which required him to produce a firearm in order to receive a suspended sentence, violated his constitutional right not to give evidence that would incriminate him "because it placed him in the untenable position of making a Hobson's choice between perjuring himself by relinquishing a gun that he had testified did not exist, or not receiving a suspended sentence." 23 Va. App. at 687-88 (emphasis added). The Virginia Court of Appeals rejected the defendant's claim that the judge's condition for suspending sentence violated the defendant's Fifth Amendment protection. See *id.* "The Fifth Amendment does not insulate a defendant from all 'difficult choices' that are presented during the course of criminal proceedings, or even from all choices that burden the exercise or encourage waiver of the Fifth Amendment's right against self-incrimination." See *id.* (citing *United States v. Frazier*, 971 F.2d 1076, 1080 (4th Cir. 1992)).

[7] See Va. Code Ann. § 19.2-295.

[8] Code § 19.2-303 permits the trial court, after conviction, to "suspend imposition of sentence or suspend the [execution of] sentence in whole or part and *in addition*

or modify a portion of a sentence and place a defendant on probation. "The purpose of this statute is to secure the rehabilitation of the offender, enabling him to repent and reform so that he may be restored to a useful place in society." *Loving v. Commonwealth*, 206 Va. 924, 930, 147 S.E.2d 78 (1966) (relying on *Slayton v. Commonwealth*, 185 Va. 357, 365-66, 38 S.E.2d 479 (1946)); see also *Coffey v. Commonwealth*, 209 Va. 760, 764, 167 S.E.2d 343 (1969). As a result, a court's authority to suspend a sentence is entirely discretionary. *Lane v. Commonwealth*, 223 Va. 713, 719-20, 292 S.E.2d 358 (1982); *Abdo v. Commonwealth*, 218 Va. 473, 479, 237 S.E.2d 900 (1977); *Slayton v. Commonwealth*, 185 Va. 357, 365, 38 S.E.2d 479 (1946).

Inherent in a court's authority to suspend a sentence is the discretion to attach certain conditions to such a suspension. See Va. Code Ann. § 19.2-303; see also *Dyke v. Commonwealth*, 193 Va. 478, 484, 69 S.E.2d 483 (1952). The sole statutory limitation placed upon a trial court's discretion in its determination of such conditions is one of reasonableness. *Anderson v. Commonwealth*, 256 Va. 580, 585, 507 S.E.2d 339 (1998) (citation omitted). The conditions of suspension must be reasonable in relation to the nature of the offense, the background of the offender, and the surrounding circumstances. See *Waiters v. Commonwealth*, 33 Va. App. 739, 536 S.E.2d 923 (2000). Conditions of probation may include, but are not limited to: court ordered participation in a local community-based probation program;[9] community service;[10] payment of restitution or reparation to the victim(s); payment of child and/or spousal support;[11] maintaining employment;[12] completion of a General Education Degree (GED);[13] and/or, participation in a sexual offender treatment program. *Husske v. Commonwealth*, 252 Va. 203, 215, 476 S.E.2d 920 (1996).

This court must therefore initially decide whether polygraph testing as a component of sexual offender treatment is a reasonable condition of probation. Hill does not challenge the effectiveness of polygraph testing of sex offenders *per se*. Indeed, this court found Lisa Hunt's testimony convincing that polygraph testing of these offenders does aid in their rehabilitation and reintegration into society. Rather, Hill argues that the special condition of

---

place the accused on probation." (Emphasis added.) Section 19.2-304 permits a court to increase or decrease the period of probation or modify any condition of probation.

[9] See Va. Code Ann. § 19.2-303.3.

[10] See Va. Code Ann. § 19.2-305.

[11] See Va. Code Ann. § 19.2-305.

[12] *Grant v. Commonwealth*, 223 Va. 680, 682, 292 S.E.2d 348 (1982).

[13] *Grant*, 223 Va. at 682.

polygraph testing unnecessarily burdens his privilege against self-incrimination. However, this court can discern no legal distinction between the questioning of probationers incident to polygraph testing and other routine questioning of probationers concerning their activities and responsibilities arising from their probationary status. Hence, this court holds that polygraph testing of sex offenders constitutes a reasonable condition of probation pursuant to § 19.2-303 of the Virginia Code absent evidence that the procedures employed by the probation officer or polygraph examiner unduly burden the probationer's Fifth Amendment right against self-incrimination.

### III. *The Applicability of the Fifth Amendment's Self-Incrimination Privilege to Probationers*

Hill contends that the Fifth Amendment privilege against self-incrimination attaches to questioning relating to both his probationary status and other unrelated alleged criminal activity. The Commonwealth, relying on the United States Supreme Court's decision in *Mitchell v. United States*, 526 U.S. 314, 143 L. Ed. 2d 424, 119 S. Ct. 1307 (1999), responds that "once the defendant is sentenced his Fifth Amendment privileges are complete." Commw. Br. in Resp. at 2. Therefore, according to the Commonwealth, a probationer has no Fifth Amendment privilege against self-incrimination. This court finds that both Hill and the Commonwealth misinterpret the relevant authorities.

A. *Applicability of the Privilege to Matters Relating Solely to Terms of Probation*

In relevant part, the Fifth Amendment provides that no individual "shall be compelled in any criminal case to be a witness against himself." This right is impressed upon the states through the Fourteenth Amendment to the United States Constitution. *Gosling v. Commonwealth*, 14 Va. App. 158, 163, 415 S.E.2d 870 (1992). It not only establishes a person's right not to testify when one is a defendant in a criminal trial but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answer might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 38 L. Ed. 2d 274, 94 S. Ct. 316 (1973) (emphasis supplied). Thus, the court must determine whether probation revocation proceedings constitute "criminal proceedings."

Any analysis of this question must begin with the United States Supreme Court's decision in *Morrissey v. Brewer*, 408 U.S. 471, 33 L. Ed. 2d 484, 92

....

S. Ct. 2593 (1972). In *Morrissey*, the Court granted certiorari to decide whether the Fourteenth Amendment required a state to grant a parolee a hearing before revoking his parole. In deciding that the due process clause required that a parolee be granted such a hearing, the Court opined that "the revocation of parole is not part of a criminal prosecution." 408 U.S. at 481. The Court reasoned that "revocation deprives an individual not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observation of special parole restrictions." *Id.*

Its very next term, in *Gagnon v. Scarpelli*, 411 U.S. 778, 36 L. Ed. 2d 656, 93 S. Ct. 1756 (1973), the Court addressed whether its holding in *Morrissey* applied to probation revocation proceedings. In deciding in the affirmative, the Court, consistent with the writings of commentators,[14] held that "probation revocation, like parole revocation, is not a stage of a criminal prosecution." *Gagnon*, 411 U.S. at 782. The purpose of both "is to help individuals reintegrate into society as constructive individuals as soon as they are able." 411 U.S. at 783 (citation omitted).

Notwithstanding the decisions in *Morrissey* and *Gagnon*, Hill asserts that this court should not promote form over substance and should look to the "nature of the penalty to be imposed in the proceeding at issue, rather than on the semantic question of whether the proceeding in question is technically termed 'criminal' or 'civil.'" Def.'s Supp. Memo in Support at 18. In so arguing, Hill relies upon the Supreme Court's decision of *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), where the Court held that the privilege against self-incrimination applies to juvenile court proceedings. Juvenile court proceedings are generally considered non-criminal proceedings. Although Hill's argument is not without substance, it ignores not only the decisions in *Morrissey* and *Gagnon* but also the Court's later decisions in *Minnesota v. Murphy* and *United States v. Apfelbaum*. See *Minnesota v. Murphy*, 465 U.S. 420, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1983) (finding no Fifth Amendment violation in questioning of sex offenders on probation); *United States v. Apfelbaum*, 445 U.S. 115, 125, 63 L. Ed. 2d 250, 100 S. Ct. 948 (1980) ("The privilege does not extend to consequences of a noncriminal nature, such as threats of liability in civil suits, disgrace in the community, or loss of employment.") (citations omitted and emphasis added). In *Murphy*, the Court relied, in part, on its decision in *Gagnon* and opined as follows:

---

[14] *Gagnon v. Scarpelli*, 411 U.S. 778, 782, n. 3, 36 L. Ed. 2d 656, 93 S. Ct. 1756 (1973).

The situation would be different if the questions put to a probationer were relevant to his probationary status and posed no realistic threat of incrimination in a separate criminal proceeding. If, for example, a residential restriction were imposed as a condition of probation, it would appear unlikely that a violation of that condition would be a criminal act. Hence, a claim of the Fifth Amendment privilege in response to questions relating to a residential condition could not validly rest on the ground that the answer might be used to incriminate if the probationer was tried for another crime. Neither, in our view, would the privilege be available on the ground that answering such questions might reveal a violation of the residential requirement and result in the termination of probation. Although a revocation proceeding must comport with the requirements of due process, it is not a criminal proceeding. *Gagnon v. Scarpelli,* 411 U.S. 778, 782, 36 L. Ed. 2d 656, 93 S. Ct. 1756 (1973); *United States v. Johnson,* 455 F.2d 932, 933 (5th Cir.), cert. denied, 409 U.S. 856, 34 L. Ed. 2d 101, 93 S. Ct. 136 (1972). Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination available to a probationer. It follows that whether or not the answer to a question about a residential requirement is compelled by the threat of revocation, there can be no valid claim of the privilege on the ground that the information sought can be used in revocation proceedings.

465 U.S. 420, 435, n. 7, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (emphasis supplied).

Strong policy arguments also counsel against the unlimited extension of the self-incrimination privilege into the context of supervised probation. Probationers maintain "conditional liberty" in comparison to an "ordinary citizen's absolute liberty." *Griffin v. Wisconsin,* 483 U.S. 868, 875, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (1987). Hence, "persons whose sentences are suspended or who are on probation enjoy less freedom than those who have not been convicted of committing a crime." *Megel v. Commonwealth,* 31 Va. App. 414, 424, n. 5, 524 S.E.2d 139 (2000). See, e.g., *Griffin,* 483 U.S. at 872 (validating warrantless searches of homes of probationers absent exigent circumstances); *Pennsylvania Board of Pardons v. Scott,* 524 U.S. 357, 141 L. Ed. 2d 344, 118 S. Ct. 2014 (1998) (holding that the exclusionary role does not apply to revocation hearings); *Anderson v. Commonwealth,* 256 Va. 580, 507 S.E.2d 339 (1998) (upholding validity of one-year voluntary waiver of Fourth Amendment rights as agreed condition of suspended sentence).

As the Supreme Court held in *Griffin*, "supervision [of probationers] ... is a 'special need' of the State permitting a degree of impingement upon privacy, that would not be constitutional if applied to the public at large." 483 U.S. at 875. "These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed." 483 U.S. at 875; see also *Loving v. Commonwealth*, 206 Va. 924, 930, 147 S.E.2d 78 (1966); *Slayton v. Commonwealth*, 185 Va. 357, 365-66, 38 S.E.2d 479 (1946). If the privilege against self-incrimination applied to the questioning of probationers concerning conditions of their probation, other than the condition to be law abiding, probation officers could be rendered virtually powerless in monitoring probationers and furthering the salutary goals of probation supervision. Probationers would be free to refuse to answer questions relating to their employment, court ordered therapy, restitution payments, out of state travel, or residential restrictions. Such a result would leave the citizenry virtually defenseless against probationers who were on the road to re-offending. Eventually, criminal offenders would also be negatively affected, as judges, who could no longer be able to rely upon verifiable conditions of probation, would necessarily become increasingly reluctant to afford offenders the privilege of a suspended sentence. Moreover, such an unwarranted extension of the privilege against self-incrimination was explicitly rejected by the Supreme Court in *Minnesota v. Murphy*, when the Supreme Court stated:

> A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution.

465 U.S. at 435. Accordingly, this court rejects Hill's position that he has a Fifth Amendment right to refuse to answer questions that could lead solely to the revocation of a suspended sentence.

B. *Applicability of the Privilege to Matters Relating to Additional Criminal Conduct of a Probationer*

The Commonwealth contends that a probationer has no Fifth Amendment right against self-incrimination because the offender's conviction and sentence

were fixed at the time of sentencing. This argument ignores the reality that probationers are subject to potential prosecution for other criminal offenses for which neither guilt nor sentence has yet been determined. Although a state may impose upon the constitutional rights of probationers to a degree that would not be constitutional if applied to the public at large, the Court's decision in *Griffin v. Wisconsin* makes clear that the "permissible degree is not unlimited." 483 U.S. at 875.

An individual does not forfeit the right against self-incrimination by reason of the conviction of a crime. Even if "a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Minnesota v. Murphy*, 465 U.S. at 426 (citing *Baxter v. Palmigiano*, 425 U.S. 308, 316, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976)) (emphasis supplied). This Court therefore rejects the Commonwealth's position that a probationer has no Fifth Amendment right against self-incrimination.

### IV. *Whether the Special Condition of Polygraph Testing Unreasonably Burdens Hill's Privilege Against Self-Incrimination*

Hill's principal basis for objecting to the court-ordered polygraph test rests upon his claim that the court has presented him with a Hobson's choice. If he elects to answer the questions, his statements could be used against him in a future criminal prosecution, and, if he declines to answer the questions, his probation could be revoked for his failure to totally cooperate with his probation officer. As such, Hill claims that he is indeed "compelled" to answer potentially incriminating questions, and, absent a grant of at least use immunity, his Fifth Amendment rights have been unreasonably burdened. Hill's argument is premised upon the assumption that the court could revoke his suspended sentence based solely upon a proper invocation of his right to remain silent in response to potentially incriminating questions. A long line of United States Supreme Court decisions, however, undermines the validity of that underlying assumption.

In *Garrity v. New Jersey*, 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967), police officers were summoned to testify in an investigation of alleged police corruption. The officers were advised of their right not to testify but were told that they would be discharged from their jobs if they elected to do so. The Court determined that forcing the officers to decide between self-incrimination and job forfeiture was "the antithesis of free choice to speak out or to remain silent." *Garrity*, 385 U.S. at 497. As a result, the Court

overturned criminal convictions that were based, in part, on the officers' unconstitutionally compelled statements. 385 U.S. at 497.

The same day it decided *Garrity*, the United States Supreme Court handed down its decision in *Spevack v. Klein*, 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625 (1967). In *Spevak*, an attorney was disbarred for asserting his Fifth Amendment privilege and refusing to honor a subpoena to produce certain financial records. The Court, in overturning the disbarment, held that the Constitution bars "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly'." 385 U.S. at 515.

The next year in *Gardner v. Broderick*, 392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913 (1968), and *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 20 L. Ed. 2d 1089, 88 S. Ct. 1917 (1968), the Court again addressed the propriety of discharging state employees for the exercise of their Fifth Amendment rights. In *Gardner*, the Court invalidated a state statute that required the discharge of any police officer who refused, on Fifth Amendment grounds, to testify before a grand jury investigating police corruption. See, 392 U.S. at 276-79. Similarly, in *Uniformed Sanitation*, the Court held that to require the sanitation employees to choose between their jobs and their constitutional right to invoke the self-incrimination privilege before a grand jury was tantamount to compulsion in violation of the Fifth Amendment privilege. 392 U.S. at 284.

In 1973 and 1977, the Court again analyzed the constitutionality of imposing sanctions for the legitimate invocation of the Fifth Amendment privilege in *Lefkowitz v. Turley*, 414 U.S. 70, 38 L. Ed. 2d 274, 94 S. Ct. 316 (1973) (hereinafter "*Lefkowitz-I*"), and *Lefkowitz v. Cunningham*, 431 U.S. 801, 53 L. Ed. 2d 1, 97 S. Ct. 2132 (1977) (hereinafter "*Lefkowitz-II*"). In *Lefkowitz-I*, two architects were summoned to testify before a grand jury investigating corruption in state contracts. The architects declined to waive their Fifth Amendment privilege notwithstanding the terms of a statute requiring the cancellation of existing state contracts and ineligibility for future contracts for a period of five years. The Court found the statute constitutionally infirm, reasoning that a "substantial economic sanction" in the form of the potential loss of state contracts was sufficient to constitute compulsion within the meaning of the Fifth Amendment. 414 U.S. 70, 82, 38 L. Ed. 2d 274, 94 S. Ct. 316.

In *Lefkowitz-II*, a New York political party officer was subpoenaed to testify before a grand jury investigating his conduct. He refused to waive his self-incrimination privilege and, pursuant to a self-executing state statute, was automatically divested of all his party offices and banned from holding any public or party office for five years. The Court declared the statute

unconstitutional, stating, "The touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids." 431 U.S. at 806.

The Court's decisions in *Garrity, Spevak, Gardner, Uniform Sanitation,* and *Lefkowitz-I* and *Lefkowitz-II* provided the underlying analytical framework for the Court's Fifth Amendment analysis in *Minnesota v. Murphy.* In *Murphy,* the defendant had pleaded guilty to a charge of false imprisonment, was given a suspended sentence, and was placed on probation. Similar to the terms of Hill's probation herein, Murphy was ordered to participate in sexual offender treatment, report to his probation officer as directed, and be truthful with his probation officer "in all matters." 465 U.S. at 422. During the course of one of his meetings with his sexual offender counselor, Murphy admitted committing a rape and murder years earlier. The counselor so advised the probation officer, who, after consulting with her supervisor, asked Murphy to come in to discuss his continuing treatment plan. During his meeting with the probation officer, Murphy admitted his involvement in the rape and murder. The probation officer reported the admissions to the police, and Murphy was charged with the commission of those crimes.

At trial, Murphy sought to suppress his confession, claiming that it was obtained in violation of his Fifth Amendment rights. The trial court denied the motion, but the Minnesota Supreme Court reversed, holding that Murphy's failure to assert the privilege was not fatal to his position "because of the compulsory nature of the meeting, because [Murphy] was under court order to respond truthfully to his agent's questions and because the agent had substantial reason to believe that [Murphy's] answers were likely to be incriminating." 465 U.S. at 425 (quoting *Murphy v. State,* 324 N.W.2d 340 (Minn. 1982)). The United States Supreme Court reversed the decision of the Minnesota Supreme Court, holding that the Fifth Amendment self-incrimination privilege is generally not self-executing and therefore, a failure to assert the privilege, absent compulsion, constituted a waiver of this Fifth Amendment right. See, 465 U.S. at 440. The Court analyzed the extent of compulsion inherent in the relationship between a defendant and a probation officer and rejected any notion that the privilege was necessarily self-executing in the context of conversations between these individuals, stating:

We note first that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones. In that respect, Murphy was in no better position than the ordinary witness at a trial or before

a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege. This much is reasonably clear from our cases.

465 U.S. at 427 (emphasis supplied).

Murphy, as Hill does here, argued that because the terms of his probation required him to be honest with his probation officer, he was compelled to make incriminating statements instead of asserting his privilege. While recognizing the potential strength of that contention, in light of *Garrity* and its progeny, the Court nonetheless rejected it.

The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution. Even so, we must inquire *whether Murphy's probation conditions merely required him to appear and give testimony* about matters relevant to his probationary status or whether they went further and *required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.* Because we conclude that Minnesota did not attempt to take the extra, impermissible step, we hold that Murphy's Fifth Amendment privilege was not self-executing.

465 U.S. at 435-36 (emphasis supplied).

Here, as in *Murphy*, there is no evidence that Hill's ability to remain on probation was "conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." 465 U.S. at 437. Hence, this court is equally "hesitant to read into the truthfulness requirement an additional obligation that [Hill] refrain from raising legitimate objections to furnishing information that might lead to his conviction for another crime." 465 U.S. at 437 (citing *Michigan v. Tucker*, 417 U.S. 433, 439, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974)). Should inquiries of Hill during the polygraph legitimately raise self-incrimination implications, Hill retains the unfettered right to assert his constitutional privilege. As the Court noted in *Murphy*, "decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." 465 U.S. at 438.

As such, Hill's alleged dilemma is illusory, not real. Use immunity, as requested by Hill, is unnecessary because Hill is not here compelled "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Husske v. Commonwealth*, 252 Va. 203, 217, 476 S.E.2d 920 (1996) (quoting *Minnesota v. Murphy*, 465 U.S. at 436). Hill has been ordered to submit to polygraph testing, not to waive his Fifth Amendment rights. See *Mangarella v. State*, 17 P.3d 989 (Nev. 2001) (holding constitutional a Nevada statute which imposes mandatory polygraph testing as a condition of probation). Neither revocation of his probation nor any other substantial penalty can be imposed as a result of a legitimate invocation of the privilege.[15] The sole limitation on Hill's right to invoke his Fifth Amendment privilege is that the claim be legitimate and reasonable. Thus, the special condition of probation requiring Hill to submit to polygraph testing does not unduly burden his privilege against self-incrimination.

## V. *The Parameters of the Legitimate Invocation of the Self-Incrimination Privilege*

Hill asserts that because he is a convicted sexual offender, he will necessarily be considered a suspect in all unsolved crimes of a similar nature.

---

[15] By so ruling, this court does not rule nor imply that the probation office would thereafter be precluded from taking appropriate remedial steps to assure continuing public safety and a successful reintegration of Hill, or any other offender, into society. Additional monitoring and counseling requirements that do not effect a "substantial penalty" would not offend the Fifth Amendment privilege against self-incrimination and could be considered or implemented. See *Minnesota v. Murphy*, 465 U.S. at 434; *Lefkowitz-II*, 431 U.S. at 805.

This court rejects Hill's claimed distinction between sexual offenders and drug dealers, burglars, or other criminal offenders. If the court were to accept Hill's position, all probationers would have to be granted use immunity before probation officers could ask them any questions relating to their probationary status. Such a result is neither necessary nor warranted. As a result, he contends that the court should rule at this time that he may assert his Fifth Amendment privilege and decline to answer any questions posed to him concerning his sexual thoughts, tendencies, or orientations, either past, present, or future, absent a grant of immunity. The court disagrees with Hill.

## A. *General Principles Regarding Invocation of the Privilege*

There is no blanket constitutional right to refuse to answer questions in a non-criminal proceeding. See *North Am. Mortgage Investors v. Pomponio*, 219 Va. 914, 918, 252 S.E.2d 345 (1979). The privilege may not be invoked "for a sentimental reason, or for a purely fanciful protection of the witness against an imaginary danger." *Apfelbaum*, 445 U.S. at 126. See, e.g., *Brown v. Walker*, 161 U.S. 591, 605-606, 40 L. Ed. 819, 16 S. Ct. 644 (1896); *Smith v. United States*, 337 U.S. 137, 147, 93 L. Ed. 1264, 69 S. Ct. 1000 (1949); *Ullmann v. United States*, 350 U.S. 422, 430, 100 L. Ed. 511 (1956); *Uniformed Sanitation Men Assn. v. Commissioner of Sanitation*, 392 U.S. 280, 284-85, 20 L. Ed. 2d 1089, 88 S. Ct. 1917 (1968); *Gardner v. Broderick*, 392 U.S. 273, 279, 20 L. Ed. 2d 1082, 88 S. Ct. 1913 (1968). The constitutional protection against self-incrimination has long been "confined to real danger and does not extend to remote possibilities out of the ordinary course of law." *Heike v. United States*, 227 U.S. 131, 144, 57 L. Ed. 450, 33 S. Ct. 226 (1913). In the seminal case of *Hoffman v. United States*, 341 U.S. 479, 95 L. Ed. 1118, 71 S. Ct. 814 (1951), the Supreme Court opined, however, that "the privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." 341 U.S. at 486.

## B. *Applicability of the Privilege to Future Conduct*

Hill argues on brief that the privilege extends to matters relating to past, present, or future conduct. Although it is clear that the privilege covers past or present conduct, the law concerning the applicability of the privilege to future conduct is not entirely settled. Hill relies, *inter alia*, on the Supreme Court's decision in *Marchetti v. United States*, 390 U.S. 39, 19 L. Ed. 2d 889,

88 S. Ct. 697 (1968). In *Marchetti*, the Petitioner challenged the constitutionality of a statute that required him to register and pay occupational taxes on wagers. He claimed that the required disclosures could potentially be used against him in future prosecution, by both federal and state authorities for violations of anti-gambling statutes. The Court agreed with Marchetti and held that the privilege attached to the disclosure requirement. Overruling its prior decisions in *United States v. Kahriger*, 345 U.S. 22, 73 S. Ct. 510, 97 L. Ed. 754 (1953), and *Lewis v. United States*, 348 U.S. 419, 75 S. Ct. 415, 99 L. Ed. 475 (1955), the Court rejected the premise that the privilege could not apply to prospective acts, stating:

> [We] see no reason to suppose that the force of the constitutional prohibition is diminished merely because confession of a guilty purpose precedes the act which it is subsequently employed to evidence. Yet, if the factual situations in which the privilege may be claimed were inflexibly defined by a chronological formula, the policies which the constitutional privilege is intended to serve could easily be evaded. Moreover, although prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination, this will scarcely always prove true. As we shall show, it is not true here. We conclude that it is not mere time to which the law must look, but the substantiality of the risks of incrimination.

390 U.S. at 53-54.

The remaining vitality of this portion of the Court's opinion in *Marchetti* has seemingly been eroded, however, by subsequent decisions of the Supreme Court. In *United States v. Freed*, 401 U.S. 601, 28 L. Ed. 2d 356, 91 S. Ct. 1112 (1971), the Court upheld the constitutionality of the amended National Firearms Act over a Fifth Amendment challenge. The original Act was found unconstitutional in *Haynes v. United States*, 390 U.S. 85, 19 L. Ed. 2d 923, 88 S. Ct. 722 (1968). The Act required transferors of firearms to register them[16] and further declared it unlawful for a person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 581(d) (1964). The unanimous Court summarily rejected a transferee's claim that the registration requirement[17] could subject the transferees to future prosecution for offenses relating to the

---

[16]  26 U.S.C. § 581(2) (1964).

[17]  The Act required that all transferees be identified by at least one photograph and the transferee's fingerprints. See 26 U.S.C. § 581(2) (1964).

registered firearms. Notwithstanding its decision in *Marchetti*, the Court found that the claimant was confronted by "trifling or imaginary hazards of incrimination" rather than "substantial and real" ones and reversed the dismissal of charges, stating:[18]

Appellees' argument assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation.

*Freed*, 401 U.S. at 606-07.

In *United States v. Apfelbaum*, 445 U.S. 115, 63 L. Ed. 2d 250, 100 S. Ct. 948 (1980), the Supreme Court again addressed its decision in *Marchetti*. In *Apfelbaum*, the Court examined the admissibility of previously immunized testimony in a subsequent prosecution for perjury and concluded "that the Fifth Amendment does not prevent the use of respondent's immunized testimony at his trial for false swearing because at the time he was granted immunity, the privilege would not have protected him against false testimony that he might decide to give." *Apfelbaum*, 445 U.S. at 130 (emphasis supplied). In so ruling, the Court acknowledged that in *Marchetti* it had rejected a rigid chronological analysis of the applicability of the privilege but emphasized it had also there observed that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination." 445 U.S. at 129 (quoting *Marchetti*, 390 U.S. at 54). The Court further relied on its decision in *Freed*, that the possibility of future prosecutions based upon potential future acts did not implicate valid Fifth Amendment concerns. See, 445 U.S. at 129. See also *Ford v. Commonwealth*, 215 Va. 308, 314, 208 S.E.2d 921 (1979) (approvingly quoting *Freed*, 401 U.S. at 606). As a result, this court finds unpersuasive Hill's argument that the Fifth Amendment privilege may validly be invoked in response to questioning concerning solely future intended conduct.

## C. *The Applicability of the Privilege to Persons Claiming Innocence*

Hill correctly asserts, however, that his right to invoke the privilege against self-incrimination is not limited to questions concerning his actual

---

[18]   See *Freed*, 401 U.S. at 606 (discussing *Marchetti*, 390 U.S. at 53-54); see also *Rogers v. United States*, 340 U.S. 367, 374, 95 L. Ed. 344, 71 S. Ct. 438 (1951), and *Brown v. Walker*, 161 U.S. 591 600, 40 L. Ed. 819, 16 S. Ct. 644 (1896)).

criminal activity. It has long been established that the Fifth Amendment protects not only the guilty but also the innocent "who otherwise might be ensnared by ambiguous circumstances," *Slochower v. Board of Higher Ed. of New York City*, 350 U.S. 551, 557, 100 L. Ed. 692, 76 S. Ct. 637-58 (1956), because truthful testimony of an innocent witness can provide the government with incriminating evidence from a speaker's own mouth. *Grunewald v. United States*, 353 U.S. 391, 421, 1 L. Ed. 2d 931, 77 S. Ct. 963 (1957). Therefore, even a person who professes absolute innocence can properly invoke the self-incrimination privilege, provided the person has reasonable cause to fear danger from a direct answer. See *Ohio v. Reiner*, 532 U.S. ___, 121 S. Ct. 1252, 149 L. Ed. 2d 158 (2001) (*per curiam*); see also *Hoffman*, 341 U.S. at 486; *Mason v. United States*, 244 U.S. 362, 365, 61 L. Ed. 1198, 37 S. Ct. 621 (1917). A witness cannot be excused from answering questions, however, merely because the witness believes that incrimination would potentially result. The witness' "say-so does not of itself establish the hazard of incrimination." *Hoffman*, 341 U.S. at 486.

### D. *Judicial Determination of the Propriety of an Invocation of the Privilege*

Ultimately, a court may become the final arbiter of the specific contours of the self-incrimination privilege in a given context and may be called upon to either sustain a witness' invocation of the privilege or order a mistaken witness to answer the questions posed. *Ohio v. Reiner*, 532 U.S. at ___; *Hoffman*, 341 U.S. at 486. A court must necessarily determine whether "real dangers, not remote and speculative possibilities" exist. *Zicarelli v. New Jersey Comm'n of Investigation*, 406 U.S. 472, 478, 32 L. Ed. 2d 234, 92 S. Ct. 1670 (1972). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486-87.

In *United States v. Sharp*, 920 F.2d 1167 (4th Cir. 1990), the United States Court of Appeals for the Fourth Circuit articulated a two-prong inquiry to be undertaken when a court examines the legitimacy of a self-incrimination privilege claim. First, the court must decide whether the requested information is incriminating in nature. The potentially incriminating nature of the information requested may be evident through the question(s) asked or the circumstances surrounding the questioning. If not, the person claiming the privilege may still be able to establish the harmful potential of a response. Second, the court must determine whether criminal prosecution is a sufficient

possibility to warrant constitutional protection. In deciding this question, a court must assess the objective reasonableness of the witness' claimed fear of prosecution. 920 F.2d at 1170-71. In making these determinations, a judge "must be governed as much by [the judge's] personal perception of the peculiarities of the case as by the facts actually in evidence." *Hoffman*, 341 U.S. at 487.

Utilizing the two-prong mode of analysis adopted by the Fourth Circuit, this court concludes that it would not be appropriate to rule on the propriety of Hill's invocation of the self-incrimination privilege at this time. Although the court agrees with Hill that any incriminating statements made by him during the polygraph test regarding other prior criminal activity could create a realistic possibility of prosecution, any attempt by the court to now determine whether such information is "incriminating in nature" would necessarily be premature as no questions have yet been posed to Hill. Consequently, it would be improper for the court to rule on the permissible scope of any such questioning at this time.

If, in response to any questions asked before, during, or after the actual polygraph test, Hill asserts a Fifth Amendment claim of privilege, which his probation officer believes to be inconsistent with the rulings and analysis set out in this opinion letter, the probation officer should so inform the court, the Commonwealth's Attorney, and counsel for Hill in writing. A list of the question(s) to which the privilege was invoked should accompany any such notification. Upon receipt of any such notice, the court will either rule on the propriety of the invocation and take appropriate action,[19] if the *bona fides* of the invocation can be determined from the circumstances related, or will schedule a hearing for all parties to present their respective positions.

## VI. *Conclusion*

For the reasons set out above, this Court holds that the imposition of a special condition of probation requiring Defendant Hulett Hill to submit to polygraph testing does not unduly burden Hill's Fifth Amendment privilege against self-incrimination. Accordingly, Hill's objection to the special condition is overruled and he is ordered to submit to such polygraph testing

---

[19] By (1) upholding the claim of privilege if the invocation was proper or (2) issuing a Rule to Show Cause why the previously suspended sentence should not be revoked if "it is *'perfectly* clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot* possibly have such tendency' to incriminate." *Hoffman*, 341 U.S. at 488 (quoting *Temple v. Commonwealth*, 75 Va. 892, 898 (1881)) (emphasis in original).

as the probation officer may require, consistent with the contents of this letter opinion.